AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | Case No. '23  MJ1494  WVG |
| *or identify the person by name and address)* | ) | |
| iPhone in sparkly case | ) | |
| ("Target Device") | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324 | Alien Smuggling and Conspiracy to Commit Alien Smuggling |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

See Attached Affidavit of NCIS Special Agent Katelyn Thompson, incorporated herein by reference.

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under* 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Katelyn Thompson*
*Applicant's  signature*

_____
Katelyn Thompson, NCIS Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 04/26/2023 _____

_____
*William V. Gallo*
*Judge's signature*

City and state: San Diego, California

Hon. William V. Gallo, US Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Special Agent Katelyn Thompson, being duly sworn, hereby state as follows:

### INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device(s):

iPhone in sparkly case

("**Target Device**")

as further described in Attachment A and to seize evidence of a crime, specifically,  Title 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (a)(1)(A)(iii) (Harboring and/or Transporting Certain Aliens), Title 8 U.S.C. § 1324(a)(1)(A)(i) (Unlawful bringing of certain aliens into the United States), Title 8 U.S.C. § 1324(a)(1)(A)(v)(II) (Aiding or abetting), Title 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Conspiracy), Title 8, U.S.C. § 1324(a)(2)(B)(ii) (Bringing in Aliens for Financial Gain), Title 18, U.S.C. § 371 (Conspiracy) as further described in Attachment B.

2. The requested warrant relates to the investigation and prosecution of Cristina Gutierrez for the conspiracy to transport illegal aliens within the United States. The **Target Device** is currently in the custody of the Department of Homeland Security, United States Border Patrol, located at 3752 Beyer Boulevard Building 24 San Ysidro, CA 92173.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents.  This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not purport to set forth all my knowledge of the investigation into this matter.   Dates and times are approximate.

### TRAINING AND EXPERIENCE

4. Your Affiant, Katelyn M. Thompson, is a Special Agent with the Naval

1

Criminal Investigative Service (NCIS) assigned to the NCIS Resident Agency, Marine Corps Base (MCB), Camp Pendleton, CA (CPC). I have held the position of a Special Agent since June 2017. Previously, I was a Border Patrol Agent assigned to Calexico, CA with the Department of Homeland Security (DHS) from 2015 to 2017 and a Transportation Security Officer assigned to San Diego, CA with DHS from 2014 to 2015. I have attended multiple Federal Law Enforcement academies, to include the Federal Law Enforcement Training Centers (FLETC) located in Glynco, Georgia, where I received instruction in criminal and Constitutional law, crime scene processing, interviews and interrogations. I also attended FLETC located in Artesia, New Mexico, where I received instruction in not only criminal law, but also immigration laws. I am a graduate of the University of North Alabama's Criminal Justice program, obtaining a Bachelor of Science degree in Criminal Justice and a minor in Security and Emergency Management, Cum Laude. In the last approximately six years I have been with NCIS, I have worked multiple human smuggling, narcotics, complex rape, adult sexual assault, attempted homicide and homicide investigations. In 2020, I was awarded Special Agent of the Year for proactive criminal investigations. In 2019, I was nominated Special Agent of the Year for general crimes. During my tenure in Law Enforcement, I have also participated in the execution of multiple search warrants relating to violations of federal, state and military laws and have received training regarding the collection and preservation of evidence.

5.      My current and previous assignments have included investigations relating to unlawful aliens and alien smuggling.  In the course of my duties, I have worked as the case agent, directing specific alien smuggling and illegal entry investigations. I have worked as a United States Border Patrol (USBP) Agent in Calexico, California, and a Special Agent (SA) at Camp Pendleton, California. I am also a certified Firearms Instructor.

6.      During my assignments, I have interviewed Defendants and witnesses relative to their illegal entry and alien smuggling.  Through my observations and these interviews,

I have gained a working knowledge and insight into the normal operational habits of unlawful aliens and alien smugglers, with particular emphasis on those who attempt to illegally enter or smuggle unlawful aliens into the United States from Mexico.

7.     Additionally, I have participated in numerous firearms investigations involving violations of state, federal, and military firearms laws.  These investigations and arrests involved: (1) unlawful use, possession, manufacturing, altering, distribution/sales, and trafficking; (2) money laundering; and (3) firearms conspiracies.   During these investigations, I have debriefed defendants, witnesses, and confidential sources; conducted surveillance; executed search warrants; seized firearms; and, made arrests for firearms offenses.   These investigative procedures have allowed me to understand the methods employed by firearms traffickers.  In particular, I am knowledgeable of the manner in which firearms/drug traffickers facilitate their illegal firearms/drug purchase/sales trade by avoiding law enforcement detection with the use of cellular telephone technology, coded communications, false or fictitious identities, hidden compartments, and counter surveillance measures.

8.     I have arrested and interviewed numerous alien smugglers and drug traffickers. Through these experiences, I have become familiar with the activities of those who coordinate smuggling events and drug trafficking events and the practices employed by the drivers/smugglers locally and abroad, including recruitment methods, transportation methods and tactics used to communicate with the drivers and avoid detection by law enforcement. I have been the case agent on numerous investigations that have led to the issuance of search, arrest, and tracking warrants for which I have been the affiant.

9.     Based on my training, work experience, and conversations with other law enforcement personnel, I am also aware that:

a.     Smugglers and traffickers will use cellular telephones/electronic devices because they are mobile, which allows them to have instant access to telephone calls, text,

web, and voice messages.

b.      Smugglers and traffickers will use cellular telephones/electronic devices because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

c.      Smugglers, traffickers, and their accomplices will use cellular telephones/electronic devices because they can easily arrange and/or discuss smuggling fees, availabilities of transportation, costs associated with smuggled aliens, and determine what time their illegal cargo will arrive at predetermined locations.

d.      Smugglers and traffickers will use cellular telephones/electronic devices to direct and coordinate the transfer and acquisition of payment for smuggling and trafficking fees, request additional fees from aliens and/or their sponsors, and coordinate drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e.      Smugglers, traffickers, and their co-conspirators often use cellular telephones/electronic devices to communicate with load drivers who transport their cargo and/or proceeds.

f.      The use of cellular telephones/electronic devices by smugglers, traffickers, and their co-conspirators tends to generate evidence that is stored on the cellular telephones/electronic devices including, but not limited to emails, text messages, WhatsApp messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, such as Instagram, Snapchat, and Facebook, and location data.

10.     Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that the violations related to alien smuggling exist on the **Target Device**.  There is also probable cause to search the **Target Device** described in Attachment A for evidence of these crimes, for the items described in Attachment B.

11.     Based upon my training, experience, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set

forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

12. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

    c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

    f. tending to place in context, identify the creator or recipient of, or

establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**SUMMARY OF FACTS SUPPORTING PROBABLE CAUSE**

13.     There is probable cause to believe evidence of the crimes will be found on the **Target Device**, including: (a) arrests of alien smuggling drivers, (b) interviews of the drivers and aliens who have been smuggled, (c) cell phone evidence, (d) social media evidence, (e) pole camera footage, and (f) follow-up interviews from pole camera footage. I believe the **Target Device** has been utilized to not only communicate with other co-conspirators within this investigation, specifically her son, Alejandro Anguiano (Alex), but to also discuss the inner workings of various alien smuggling operations.

14.     Throughout the investigation, agents learned that this human smuggling organization recruits drivers to pick-up and transport illegal aliens (IAs) for financial gain to various destinations, including Gutierrez' residence, where she lives with her husband and daughter.

**FACTS SUPPORTING PROBABLE CAUSE**

*1.      Identification of Promaster Van that was Later Used in Smuggling Event*

16.     On May 29, 2022, Witness 12 (W-12) and Witness 13 (W-13) were arrested by the Border Patrol for transporting seven IAs within the United States. During a post-*Miranda* interview, W-12 stated that before the smuggling event, he and W-13 were contacted by "Patron." "Patron" said to drive to pick up twenty handheld radios. W-12 further explained that "Patron" instructed him to keep the handheld radio labeled #12. W-12 mentioned that he would receive instructions pertaining to the smuggling event via the handheld radio, phone calls, and text messages.

17.     W-12 explained that the remaining handheld radios were delivered to an unknown subject who drove a white Dodge Cargo van with a CA license plate at the Viejas Casino parking lot. W-12 stated he could not recollect the full license plate but remembered

6

the last three digits were "1F3".

18.     In a post-*Miranda* interview at approximately 10:48 p.m., W-13 stated that he was introduced to the smuggling job by a guy named "spooky."[1]  W-13 stated that he had made several attempts to smuggle in the Campo, CA area but was only successful once when he took the IAs to Los Angeles, CA, and was paid $3,000. After signing a form giving the agents consent to search W-13's phone, agents saw numerous messages regarding human smuggling. Within the conversations, numerous vehicles were mentioned as being involved in human smuggling operations. One of the vehicles that was discussed was a white ram van bearing CA plate 99931F3.

19.     Records checks revealed CA license plate 99931F3 was a 2017 white Ram Promaster cargo van registered to Zip Delivery Services or Julio Noe Ramos at PO Box 2147 Garden, California. On July 11, 2022, the Promaster was reported stolen by Julio Ramos .

### 2.     *W-3 was Arrested Transporting Five IAs in the Promaster Van Near the House Gutierrez Lives At*

20.     On July 19, 2022, at approximately 6:20 PM, the Los Angeles Sheriff's Department Compton encountered the aforementioned Promaster van wrapped as an Amazon van, near 1420 North McKinley Ave, Los Angeles, CA. Through additional investigation agents determined that 1420 North McKinley Ave is approximately .1 miles from 730 E 138th Street, Los Angeles, CA 90059, which is believed to be the[2] home of Alex's family members Ramon Anguiano, Luzximena Anguiano, and Gutierrez.

---

[1] "Spooky" is an unidentified individual.

[2] Commercial database queries and property deed information revealed, as of January 22, 2022, R. Anguiano is the sole owner of the house 730 E 138th St, Los Angeles, CA. The house was previously owned by R. Anguiano and his wife, Gutierrez.

21.     Based on my conversations with HSI Special Agent Ryan McMullen I understand the following:

a.     On July 19, 2022, at 6:15 p.m., in Compton, CA, Los Angeles Sheriff's Department ("LASD"), Deputy V. Dingillo was on patrol when she conducted a records check of an Amazon utility van driving in front of her. The records check indicated that the van had been reported stolen. LASD Deputy Dingillo initiated a traffic stop of the van and ordered the driver, W-3, and all the passengers out of the van, pending a stolen vehicle investigation.

b.     According to HSI McMullen, LASD subsequently contacted HSI – Los Angeles, CA, regarding the recovered stolen van and five possible undocumented noncitizens hiding in the rear cargo area of the vehicle.

c.     HSI SAs Dwight Min, Erin Herrgott, and Robert Miyakawa responded to the LASD Compton Station, where the van's occupants were transported to, and asked the five passengers for their identification documents. The only documents provided to HSI SAs were Mexican voter identification documents. HSI SAs requested database records checks utilizing HSI resources and were advised that the following five passengers were citizens and nationals of Mexico: Witness 5 (W-5); Witness 6 (W-6); Witness 7 (W-7); Witness 8 (W-8); and Witness 9 (W-9). HSI SA's also learned that W-5, W-6, W-7, W-8, and W-9, had entered illegally.

d.     On January 18, 2023, Supervisory BPA Juan Avalos, Supervisory BPA Steve Vargas, BPA Benjamin Moretti, HSI SA Ryan McMullen, and I interviewed W-5 in the presence of his attorney. During the interview, W-5 provided the following information:

22.     W-5 stated his cousin helped him be smuggled into the United States by making the arrangements with a man named "Ricardo" before departing his hometown in Guerrero, Mexico. W-5 said that on June 21, 2022, he traveled from Guerrero, Mexico, to Tijuana, Mexico, where he stayed with a cousin.

a.     W-5 stated the initial smuggling arrangement was for him to be smuggled and delivered to his cousin in Washington state for a fee of $15,000 USD. W-5 explained that during his smuggling attempts, he stayed at an apartment in Tijuana, Mexico.

b.     W-5 stated prior to this apprehension on July 19, 2022, in the "Amazon" van, he had a total of three smuggling attempts where Border Patrol arrested him. According to queries in DHS databases, W-5 was encountered illegally in the United States on July 4, 2022, July 8, 2022, and July 16, 2022, all within the San Diego Sector area of responsibility.

c.     W-5 stated on the day he was arrested, July 19, 2022; he was picked up from the apartment in Tijuana, Mexico, and taken to the border in a vehicle. W-5 said the driver of the vehicle and all members of the smuggling organization wore facemasks and never said their names. W-5 stated that upon reaching the border, there were several more smugglers and 20 or more IAs.  W-5 explained that the whole smuggling operation was very organized, and different members had different roles.

d.     W-5 stated the IAs were broken up in groups of five and sent on different routes at the same time and in proximity of each other. W-5 explained how he was able to observe how the other groups were apprehended by the Border Patrol, but his group was able to crawl away and avoid being found. W-5 stated he was told that the plan was for all of the groups to meet and load into the same vehicle. W-5 stated they walked for approximately 20 minutes, and after crawling to a dirt road; they waited for a couple of

hours. W-5 stated they were informed that a blue van with letters on the side would pick them up. After waiting for two hours, a van did in fact, back up to their location. W-5 stated that the driver exited the van and opened the back door for his group to enter it.

e.      W-5 stated in total five of them loaded into the van. W-5 could not identify the driver and said he was a young male with long curly hair. W-5 stated they were all lying on the van floor with their faces down. W-5 was asked if he remembered what the letters on the van said and he stated, "Amazon."

f.      W-5 stated once they were on the highway, W-5 received a call from a man who claimed to be named "Alex."[3] According to W-5, Alex requested the names of the IAs in the van with him and who they "belong to." W-5 said the person on the phone told him all of the people (IAs) were supposed to be delivered to one house. According to W-5, he was told they would all go to the same house, and then "they" would contact the families to determine where they would be picked up or taken. W-5 said he sent the names of the individuals in the van to the phone number that called him (phone number ending in 2924).

g.      When agents asked W-5 who "Alex" was, he stated he believed "Alex" was the one responsible for arranging transportation for him on the north side and collecting his smuggling fees. W-5 explained that while he was at the apartment in Tijuana, Mexico, they told him that he was one of "Alex's" IAs. W-5 also said that there was a ledger in the apartment where all the IAs who were staying there had to write their names and who they "belong to." W-5 stated, besides him, there was one other IA that wrote "Alex" next to his name.

---

[3] During an interview with W-5, he informed me and the Agents present, that "Alex" had phone number (52) (312) 299-2924. I know through this investigation that the aforementioned cellular phone number has been attributed to Alex's co-conspirator, Arturo Valle Jr.

### *3.     Identification of Alex's Instagram Account and Phone Number*

23.     On January 2, 2021, Border Patrol Agents (BPAs) assigned to the Campo Border Patrol Station arrested W-1 for attempting to smuggle three IAs within the United States. During a post-*Miranda* interview, W-1 provided the following information: W-1 stated that she and her friend met some boys at a club where they were working in downtown Los Angeles, CA. W-1 stated that one of the boy's names was Oscar Herrera, hereunto referred to as Herrera. W-1 described Herrera as a Hispanic male between the ages of 21-23 years old with dark features. W-1 showed BPA Robbins on her cell phone the phone number she had for Herrera.

24.     W-1 stated Herrera was working with "Alex," who was the other boy she met at the club. W-1 stated she does not know Alex's last name, but she knows that he lives in Mexico and has the phone number of 523131194511. W-1 provided the Instagram username of activee.64 for Alex. Through additional investigation, agents determined that the Instagram username belongs to Alex.

25.     W-1 believed Herrera worked for Alex and that Alex was the main boss. W-1 stated that on the date of her arrest, she posted on her Instagram that she was heading to Orange County, and Herrera called her on her cell phone asking her if she would pick up his uncle and a friend. W-1 stated that Herrera said he would give her gas money and a couple hundred extra dollars. W-1 said she figured it would be like Uber and did not know the people were illegal.

26.     W-1 showed BPA Robbins the coordinates from her phone that Herrera sent her. Herrera told her to take the Buckman Springs Road exit off the Interstate 8 freeway and then take Hwy 94 east. W-1 stated she then turned onto a dirt road and when she got to the location of the coordinates, she saw three people come out of the "woodworks" and get into the back seat of her car.

27.     W-1 stated she drove out the way she came in, and she started to "get sketched

out" when the people in her back seat were crouching down. W-1 stated she thought, "What did these people just do?" W-1 said a few minutes later she saw Border Patrol behind her. BPA Robbins questioned W-1 as to why she ran from the Border Patrol Agent that tried to pull her over. W-1 stated she was scared to pull over because she was on a dirt road and did not know what to do. W-1 stated she then pulled over and yelled at the people in the back seat to get out of her car. W-1 stated that the people jumped out of her car and ran, and she kept going until she found a paved road.

28.   On January 9, 2022, BPA Benjamin Moretti, BPA Eugene Wesley, Supervisory BPA Steve Vargas, and I conducted an interview with W-1 about her involvement with the individuals she previously mentioned during her post-*Miranda* statement (Alex and Herrera).

29.   During the interview, W-1 admitted to a prior trip picking up a female in San Diego, CA, and transporting her to Los Angeles, CA. W-1 did not state an exact date of when this occurred, but said she had not been working with Alex and Herrera for more than two months. W-1 stated at the time she was unsure whether the female was an IA. However, in hindsight, she now believes the female may have been an IA. W-1 said she could not remember the date that Herrera asked her to pick the female up from a house in San Diego, CA, and transport the female to his apartment located in Los Angeles, CA. W-1 said she and her friend, picked up the female and transported her to Herrera's apartment. Nevertheless, when they arrived at Herrera's apartment, Herrera did not answer his phone. W-1 said despite attempting to contact Herrera for approximately two hours, he did not answer.

30.   Therefore, W-1 contacted Alex via his Instagram username, activee.64. W-1 said she told Alex that Herrera was not answering his phone. In return, Alex told W-1 to take the female to Alex's dad's house, and that his dad would pay them. W-1 said she subsequently drove to Alex's dad's house, which she believed was located in Compton, CA.

Through additional investigation, agents determined R. Anguiano, Alex's father, resides at 730 138th St. Los Angeles, CA, which is in or near the Compton, CA area).[4]

31.     W-1 said upon arriving at Alex's dad's house, an older Hispanic male exited the house and walked to the front passenger side of the vehicle. W-1 said the female, whom she and her friend picked up and transported, got out of the vehicle and started walking to the front of the house. W-1 said the Hispanic male, who she believed to be Alex's dad, handed her friend approximately $500.00 USD, which she and her friend split ($250.00 USD each) for transporting the female from San Diego, CA to the house.

32.     During the interview, W-1 was provided two photographic lineups. W-1 positively identified Alex. Additionally, W-1 positively identified within the photographic lineup R. Anguiano as being the man who walked to the vehicle she was driving and paying her and her friend. Despite identifying both Alex and R. Anguiano, W-1 elected to not sign any of the lineup documents as she stated she was concerned for her safety.

> *4.     Discussion and Coordination of Alien Smuggling Over Instagram Between Gutierrez, and A. Anguiano*

33.     On October 21, 2022, Border Patrol Agent Benjamin Moretti received a federal search warrant signed by the Honorable Karen Crawford, Magistrate Judge, Southern District of California in case number 22mj3890 to search a Alejandro Anguiano's (Alex) Instagram account for violations of 8 U.S.C. § 1324 (Alien Smuggling). Alex frequently uses his Instagram account, activee.64, to talk with co-conspirators, to include but not limited to Gutierrez, and to plan IA transportation events.

34.     On August 6, 2021, Alex utilized his Instagram account to message an unidentified individual who utilized Instagram username, "_carolinnaaa.e." Alex asked the

---

[4] Commercial database queries and property deed information revealed that, as of January 22, 2022, R. Anguiano is the sole owner of house at 730 E 138th St, Los Angeles, CA. The house was previously owned by R. Anguiano and his wife, Gutierrez.

unidentified individual to go pick up $5,000 from his "mom" [Gutierrez] and send it "here." After the unidentified individual informed him he or she would, Alex responded, "my mom knows." I believe Alex's response regarding his mom knowing that the unidentified individual would be getting $5,000 from her implies that Alex and his mother had a separate conversation regarding the exchange of money. Due to Alex being located in Mexico and Gutierrez residing in Los Angeles, CA, I believe Alex informed Gutierrez about the exchange of money through the **Target Device**, as individuals often use their cell phones to communicate via Instagram. Moreover, I know that even when individuals get new phones, they often log onto the same cell phone applications, like Instagram, and the content, including messages, is available on their new phones.

35.     Alex, using his activee.64 Instagram account, messaged his mom, Gutierrez, at her senorabonitaa Instagram account.[5] On or about March 5, 2022, Alex messaged his mom and said, "I crossed 35 ppl" and "today." Soon after Alex and Gutierrez exchanged the following messages on Instagram:

> Gutierrez: I been feeding a lot
>
> Alex: I been up since 6
>
> Alex: My time
>
> Gutierrez: Ima give them coffee right now
>
> Alex: Ok
>
> Gutierrez: I feel like I've been working a lot today
>
> Gutierrez: Lol
>
> Gutierrez: Feeding them all taking the money counting etc.
>
> Alex: Yea

---

[5] Agents believe through the context of the conversations that the senorabonitaa account belongs to Alex's mom, Gutierrez. Specifically, because within the messages Alex calls senorabonitaa mom and she calls Alex son. Furthermore, an open-source query of senorabonitaa on Instagram revealed a profile photograph of Gutierrez, and the biographical section indicated "Cristina Gutierrez."

Alex: Loading them and making sure they get home is the hard part

35.     I believe when Gutierrez said, "Ima give them coffee," Gutierrez was saying she would give IAs coffee. I further believe when Gutierrez said, "feeding them all taking the money counting etc." she was telling Alex what she was doing. However, I believe this message, also shows her role in the conspiracy—she feeds IAs, takes the money that is payment for the IAs smuggling fee, and counts the money.  When Alex said, "loading them and making sure they get home is the hard part," I believe "them" referred to IAs and "loading" them referred to IAs getting or "loading" into a vehicle to be transported within the United States. I know through my training and experience that messages from third party applications will remain on an individual's cellular phone, like the **Target Device**, until they are deleted. I also know that individuals involved in IA smuggling operations utilize their cellular phones, like the **Target Device**, to communicate with the drivers who drop the IAs off at their stash houses.  Individuals also utilize their cellular devices to call and or message the IAs families to arrange for them to be picked up.

### *5.     Pole Camera Footage Shows R. Anguiano is Involved in Alien Smuggling*

36.     I know through my review of NCIS Technical Agent Brendon Laturno's report, on September 1, 2022, NCIS Technical Agent Brendon Laturno installed a pole camera within the vicinity of 730 E 138th Street, Los Angeles, CA, where R. Anguiano, L. Anguiano, and Gutierrez live.

37.     The pole camera has the capability to not only broadcast a live feed, but also store historical footage that can be viewed at a later date. Supervisory BPA Juan (SBPA) Avalos has access to the live video feed and the historical pole camera footage and he has watched/reviewed the pole camera footage and observed several occasions activity he believed to be consistent with alien smuggling activity at 730 E 138th Street, Los Angeles, CA.

38.    BPA Nicolescu also reported observing the following activity involving a Ford F-150 consistent with alien smuggling on February 24, 2023:

a.    At approximately 9:59 AM, a Ford F-150 passed the house at 730 E. 138th Street, then turned around, and parked in front of the house at 730 E. 138th Street. About two minutes later, a female passenger, who appeared to have gotten off the phone, exited the truck, and entered the house at 730 E. 138th Street. The driver of the truck did not exit.

b.    At about 10:04 AM, the female left the house at 730 E. 138th Street with a male individual. The female opened the rear door of the Ford, allowed the male to enter, and then sat in the front passenger seat. The Ford F-150 then left.

c.    Ford F-150 has been identified as a 2002 F-150 bearing California license plate 601AK, registered to Witness 10 (W-10) out of Victorville, California.

39.    BPA Nicolescu indicated that, based on his observations, the activity observed at the house at 730 E. 138th Street was consistent with successful alien smuggling events.

40.    BPA Nicolescu and I both know from our training and experience it is common for alien smuggling events to take place at night under the cover of darkness. Additionally, it is common for drivers to drop off recently smuggled IAs at stash or drop houses throughout Southern California, including in Los Angeles, CA. It is also common for IA smuggling drivers to not be familiar with stash house locations and routinely require additional instructions. Specifically in the event with the GMC, the driver of the GMC walked up to the house at 730 E. 138th Street twice, then went back to the GMC and waited for instructions before parking inside in the driveway of the house at 730 E. 138th Street.

41.    On April 3, 2023, Supervisory Special Agent Juan Avalos reported observing the following activity:

a.    At 10:27 P.M., a white sedan stopped in front of the house at 730 E. 138th Street.

b.     Approximately two minutes later, a male, believed to be R. Anguiano, exited the house at 730 E. 138th Street and approached the white Sedan. The male was observed speaking to the driver of the sedan and reaching over to hand the driver something. SBPA Avalos advised that the male's action was consistent with other previous observations and SBPA Avalos, based on his training and experience, believes this action was R. Anguiano was paying load drivers after completing a successful alien smuggling operation.

### 6.     *Follow-up Investigation Based on Poll Camera Footage*

42.     On March 9, 2023, Border Patrol Agents interviewed Witness 11 (W-11), who had picked up an individual from the house at 730 E. 138th Street on February 24, 2023, in a Ford F150 with California license plate 601AK (disabled plate). W-11, in the presence of her husband, said:

a.     W-11 was born in Guadalajara, Jalisco, Mexico. However, she obtained her United States citizenship about four or five years ago.

b.     W-11 said that she was asked to pick up a young man by an individual named, Jose. Jose asked W-11 if she could do him a favor and go to Los Angeles, California, and bring him back to Victorville, California. W-11 said that Jose is a friend that works as a gardener.

c.     W-11 said that Jose gave her an address of where to go (730 E. 138th Street). W-11 said that she was not going to charge Jose anything for picking up the individual, and that they only asked for $100 for gas. W-11 looked at her cellphone map and see the address they drove to was 730 E. 138th Street, Los Angeles.

d.     W-11 said they arrived at the house in the morning, she knocked, and asked for the young man. W-11 could not remember if the young man was named Rodrigo or Ramiro.

e.     W-11 said inside the house there was a man and a woman, and she was

told to sit. W-11 described the man as being about 50 to 55 and Mexican. The man told her to come into the house. W-11 waited in the living room that was located near the entrance, the man went out to the back, and then brought back the young man and gave him to W-11.

        f.    W-11 said the woman was about 50 years old and Mexican. W-11 said W-11 handed an envelope with approximately $9,000 to $10,000 USD to the woman. Agents asked W-11 whether the $9,000 to $10,000 was to have the young man crossed illegally from Mexico into the United States. W-11 responded, "Yes, I think so, that is what they paid." W-11 admitted that the young man that she picked up was illegally present. W-11 said she was in the house for less than five minutes.

        g.    W-11 said that she thinks the man and the woman in the house at 730 E. 138th Street are a married couple and that they live at the house at 730 E. 138th Street. She also stated they spoke Spanish. W-11 said she did not see anyone else besides them in the house.

        h.    W-11 could not identify anyone from the house in a photographic lineup.

        i.    W-11 was shown a photograph of the house at 730 E. 138th Street and asked if that was the house that she went to, to which W-11 stated, "Yes."

43.    W-11's husband, W-10, was also asked questions. He said everything was done through W-11 and that W-11 told him where to go and what they were doing. W-10 also admitted that they knew they were picking up someone that had recently illegally crossed the border because W-11 had told him.

### 7.    *C. Gutierrez Arrest and Seizure of the **Target Device***

44.    C. Gutierrez was arrested based on an arrest warrant on April 13, 2023. The **Target Device** was in her hand and was seized at the time of arrest.

45.    Based upon my experience and training, consultation with other law enforcement officers experienced in alien smuggling/drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact

names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Device**.  In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the **Target Device** to communicate with others to further the smuggling of illegal aliens into the United States. Further, in my training and experience, alien smugglers may be involved in the planning and coordination of transporting and smuggling events in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the aliens.

46.     I hereby request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to again search the **Target Device**, and seize the items listed in Attachment B, using the forensic and/or manual methodology described below. Accordingly, I request permission to search the **Target Device** for data beginning on March 5, 2022, up to April 14, 2023.

## METHODOLOGY

47.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones, tablets, and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or

hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

48.     Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant. A manual analysis of the data contained within the **Target Device** will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

49.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one hundred and twenty (120) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

49.     The government has not previously attempted to seek this evidence.

## SEALING REQUEST

50.     This is an ongoing investigation and premature disclosure of the investigation could endanger agents and officers, cause some or all of the targets of the

investigation and others to flee, cause destruction or tampering of evidence, and, consequently, seriously jeopardize the success of this investigation.  Therefore, I request that this Affidavit, the application for the search warrant, the search warrant, Attachments A and B, and all other associated court records be sealed until further order of the Court.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

**CONCLUSION**

51.     Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of evidence of a crime, specifically,   Title 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (a)(1)(A)(iii) (Harboring and/or Transporting Certain Aliens), Title 8 U.S.C. § 1324(a)(1)(A)(i) (Unlawful bringing of certain aliens into the United States), Title 8 U.S.C. § 1324(a)(1)(A)(v)(II) (Aiding or abetting), Title 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Conspiracy), Title 8, U.S.C. § 1324(a)(2)(B)(ii) (Bringing in Aliens for Financial Gain), Title 18, U.S.C. § 371 (Conspiracy)

52.     Accordingly, I request that the Court issue warrants authorizing law enforcement to search the item described in Attachment A and seize the items listed in Attachment B using the above-described methodology.


I swear the foregoing is true and correct to the best of my knowledge and belief.


*Katelyn Thompson*
Katelyn Thompson, Special Agent
Naval Criminal Investigative Service


Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 26th day of April, 2023.


*William V. Gallo*
Hon. William V. Gallo
United States Magistrate Judge

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following property is to be searched:

iPhone in Sparkly case

**(Target Device)**



The **Target Device** is currently in the custody of the United States Border Patrol, 3752 Beyer Boulevard Building 24 San Ysidro, CA 92173.

# ATTACHMENT B

ITEMS TO BE SEIZED

Authorization to search the **Target Device** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below.  The seizure and search of the **Target Device** shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Device** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of March 5, 2022 (the date Gutierrez sent a message saying, "Feeding them all taking the money counting etc.") through April 14, 2023 (the day after Gutierrez was arrested).:

a.  tending to indicate efforts to smuggle aliens from Mexico into the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.  tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d.  tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.  tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved

in the activities described above;

which are evidence of violations of Title 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (a)(1)(A)(iii) (Harboring and/or Transporting Certain Aliens), Title 8 U.S.C. § 1324(a)(1)(A)(i) (Unlawful bringing of certain aliens into the United States), Title 8 U.S.C. § 1324(a)(1)(A)(v)(II) (Aiding or abetting), Title 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Conspiracy), Title 8, U.S.C. § 1324(a)(2)(B)(ii) (Bringing in Aliens for Financial Gain), Title 18, U.S.C. § 371 (Conspiracy).